The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.



Russ Kendig
United States Bankruptcy Judge

**Dated: 02:24 PM January 29, 2015**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| MARTIN L. MYERS, | ) | CASE NO. 11-61426 |
| | ) | |
| Debtor. | ) | JUDGE RUSS KENDIG |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | **(NOT FOR PUBLICATION)** |

This case is before the court on a joint motion to compromise filed by the chapter 7 trustee, Anthony J. DeGirolamo ("Trustee"); the debtor, Martin L. Myers ("Debtor") and Debtor's non-filing spouse, Karen Myers ("Mrs. Myers"). The motion is opposed by MD Acquisition, LLC ("MDA"), Martin Designs, Inc. ("Martin Designs") and James E. Arnold & Associates, LPA ("Arnold Assoc.") (collectively "Creditors"). The court held a hearing on December 4, 2014 and the parties have submitted post-hearing briefs.

The court has jurisdiction of this case under 28 U.S.C. § 1334 and the order of reference, General Order 2012-7, dated April 4, 2012. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

1

## BACKGROUND

Debtor is an entrepreneur and businessman and former owner of Martin Designs. In 2003, MDA purchased the majority interest of Martin Designs. In 2005, MDA and Martin Designs sued Debtor in state court for breaches of several agreements associated with the sale transaction. MDA and Martin Designs obtained multi-million dollar judgments against Debtor.

The parties engaged in settlement talks, with MDA demanding $10 million, $4 million of the total in cash. On April 25, 2011, Debtor countered with two proposals in the $6 million range. His proposals included cash payments of $1.65 million and $2.35 million, respectively, and various notes for the balance. Four days after submitting his counter-proposals, Debtor filed bankruptcy.

The bankruptcy case is now almost four years old. Numerous issues arose in the course of the case. The following is a list of pending, unresolved issues related to the subject compromise:

1. Trustee's § 727 action alleging Debtor transferred and/or concealed interests and property and/or failed to keep records and therefore is not entitled to a discharge. DeGirolamo v. Myers (In re Myers), Adv. Case. No. 12-6042.

2. Ownership of Double M, Ltd. ("Double M"). Debtor is the sole legal owner. However, Mrs. Myers asserts an interest, either as an owner under an equitable lien or constructive trust theory, or as a creditor. Double M was a real estate investment company and, among other interests, owned a parcel of Florida real estate referred to as "Bayfront." Trustee sold the property and approximately $1.9 million is being held in escrow. Mrs. Myers asserts a fifty percent interest in the proceeds, claiming that she contributed funds from the sale of another jointly owned property, which was owned under a tenancy by the entirety, which paid the mortgage on Bayfront, leaving Bayfront free and clear at the time of sale, thereby resulting in unjust enrichment to the estate. This issue is also part of Mrs. Myer's amended motion for partial summary judgment on count six of the complaint in Myers v. DeGirolamo (In re Myers), Adv. Case No. 12-6104.

   Mrs. Myers filed an amended motion to compel abandonment of Debtor's interest in Double M, arguing there is not equity to the estate when her interest/claim is accounted. (Am. M. Compel, Main Case ECF No. 230)

   Additionally, Trustee also filed a complaint against Double M, alleging it is the alter ego of Debtor and seeking to recover fraudulent and preferential transfers. DeGirolamo v. Double M, Ltd. (In re Myers), Adv. Case No. 13-6063.

3. Mrs. Myers' proof of claim for $4.2 million. Her claim is comprised of the

following components:

      i.   $3 million for funds invested/used by Double M
     ii.   $279,000 for funds invested/used by Pet Brands
   iii.   $300,000 for funds invested/used by Amberwood
   iv.   $640,000 for funds invested/used by Martin Myers

(Proof of Claim No. 19)

4. Trustee's fraudulent transfer action, and other counts, against Debtor and Mrs. Myers, styled <u>DeGirolamo v. Myers (In re Myers)</u>, Adv. Case No. 13-6064.   The trustee alleges Debtor transferred $500,000 to his wife's account six days after the state court judgment was issued.   Debtor and his wife claim the money was used to pay state court legal fees and expenses.

5. Trustee's adversary complaint against Devonshire Fund, LLC ("Devonshire"), Debtor, and others.   <u>DeGirolamo v. Devonshire Fund, LLC (In re Myers)</u>, Adv. Case No. 13-6065.   Devonshire purchased Amberwood Shopping Center in a foreclosure sale in 2010.   Trustee alleges there were side deals in favor of Debtor that are intended to secret assets and/or ownership.   Additionally, Devonshire assumed a maintenance agreement with Double M and Mrs. Myers is asserting control.

6. Trustee's adversary complaint against Marmat Int'l Ltd. ("Marmat").   <u>DeGirolamo v. Marmat Int'l Ltd. (In re Myers)</u>, Adv. Case No. 13-6066.   In this action, Trustee contends that Debtor has an undisclosed ownership interest in Marmat and that distributions have been deferred or made to others on Debtor's behalf.

7. Trustee's action against Primary Colors Design Corporation ("Primary Colors") charging Debtor with an undisclosed equitable interest in the company.   <u>DeGirolamo v. Primary Colors Design Corp. (In re Myers)</u>, Adv. Case No. 13-6067.

8. Karen Myers' amended application for administrative expenses incurred in maintaining estate property, including their marital residence, Debtor's interest in non-residential real estate, a Columbus condominium used by their daughter, and other personal property.   The claim totals almost $68,000. (Am. App. for Admin. Exp., ECF No 623)

9. The Myerses' objections to the fee applications of Trustee's professionals. (Jt. Obj. to Prof. Fees, ECF Nos. 477 and 478)   To date, Trustee's attorneys and accountants have been paid approximately $711,000 for services rendered through September 26, 2012 (attorneys) and October 26, 2012 (accountants).   The court allowed one-half (1/2) of the requested fees in the most recently filed fee applications.   Consideration of the remaining one-half (1/2) balance was deferred to a future, undetermined date. Based on information presented in MDA's response to the motion to compromise, the fees which have not been submitted to the court are in the $1.5 million range.

On November 11, 2014, Trustee, Debtor and Mrs. Myers filed a joint motion to compromise all of the pending issues. Their agreement was the result of intense mediation proceedings before the Honorable Mary Ann Whipple, United States Bankruptcy Court, Northern District of Ohio. In condensed form, the parties agreed:

1. Mrs. Myers would receive $425,000 of the Bayfront sale proceeds and the estate would receive the balance of approximately $1.5 million;
2. Trustee would transfer the remaining real property and personal property to Mrs. Myers;
3. Trustee would dismiss his adversary proceedings against the Myerses and all other defendants, including the § 727 action;
4. Mrs. Myers would withdraw her proof of claim and her administrative expense claim;
5. Mrs. Myers would abandon her claims against Double M;
6. The Myerses would withdraw their objections to the fee applications.

According to the Trustee's July 23, 2014 interim report, the estate has $1,000,000. Paragraph fifty-eight of the compromise motion references collection of an additional $200,000 since the report. With the additional $1.5 million from Bayfront, this would bring the total estate value to approximately $2.75 million. After payment of administrative expenses and priority claims, MDA estimates that unsecured creditors will receive, at most, three to four percent (3-4%) on their claims. Both MDA and the bankruptcy trustee for the Martin Designs bankruptcy estate[1] filed claims exceeding $10 million.

## DISCUSSION

Creditors raised two main objections to the compromise. First, they contend the compromise does not contain adequate facts for them to make a determination as to the efficacy of the compromise. Second, they challenge Trustee's ability to settle a § 727 action against Debtor on the present facts.

### I.     Fair and equitable compromise

To approve the settlement, the court must determine that it is fair and equitable. The standard utilized in the inquiry hails from the Supreme Court:

> There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself [or herself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such

---

1 Martin Designs filed bankruptcy on February 21, 2008.

> litigation, the possible difficulties of collecting on any judg-
> ment which might be obtained, and all other factors relevant
> to a full and fair assessment of the wisdom of the proposed
> compromise. Basic to this process in every instance, of course,
> is the need to compare the terms of the compromise with the
> likely rewards of litigation.

Rankin v. Brian Lavan and Assoc., P.C. (In re Rankin), 438 Fed.App'x 420, 426 (6th Cir. 2011) (unpublished) (citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968)).

In further refinement of the analysis, the Sixth Circuit Court of Appeals uses four considerations to determine whether a compromise is fair: (1) the probability of success if litigated, (2) the complexity, expense, delay, etc. of litigation, (3) collectability concerns, and (4) the interest of creditors, including their reasonable views on the compromise. Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC), 728 F.3d 567, 576 (6th Cir. 2013) (citing Bard v. Sicherman (In re Bard), 49 Fed.App'x 528, 530 (6th Cir. 2002) (quotation omitted)). The burden of proof by a preponderance of the evidence rests with Trustee. Gen. Motors Acceptance Corp. v. Flynn (In re Midway Motor Sales, Inc.), 407 B.R. 442 (B.A.P. 6th Cir. 2009) (citing Velde v. First Nat'l Bank & Trust (In re Y-Knot Constr., Inc.), 369 B.R. 405, 408 (B.A.P. 8th Cir. 2007)).

## A. Probability of success

### i. Litigation with Mrs. Myers

Trustee did not thoroughly assess the probability of success in litigation. Instead, his argument focused on the position that the time, expense and unknowns of further litigation outweighed any potential litigation success. The court therefore has to independently consider his chance of success in evaluating the settlement offer.

Two big ticket items at the heart of this compromise are Mrs. Myers' claimed interest in Double M and her proof of claim, which overlap. Both relate to the largest known asset of the estate which has not been liquidated. Any success she has on either comes to the detriment of the estate and the unsecured creditors. Consequently, Trustee has much to gain, and lose, with this litigation.

Mrs. Myers asserts an equitable ownership of Double M. Notably, these equitable lien/constructive trust arguments are often formidable in light of Sixth Circuit case law. XL/Datacomp, Inc. v. Wilson (In re Omegas Grp., Inc.), 16 F.3d 1443, 1451 (6th Cir. 1994)). Consequently, the court is slightly inclined in Trustee's favor on the probability of success in the Double M adversary on this theory. But Mrs. Myers also filed a $4.2m proof of claim, $3m of which relates to her alleged position as a creditor of Double M. If she successfully proves that she is a Double M creditor, she will be entitled to any assets of Double M before Trustee because

only Debtor's membership interest in Double M is property of the bankruptcy estate. *See, e.g.,* In re Saunier, Case No. 11-60997 (Bankr. N.D. Ohio Nov. 21, 2012) (citations omitted).   As a result, there is a dollar-for-dollar loss to the estate for any dollar she proves she is a creditor of Double M, so litigation comes at substantial risk.

The probability of her success is difficult to weigh.   On one hand, proving a claim as a creditor is not as difficult as proving an equitable ownership.   However, demonstrating her creditor position may require her to prove that the funds originated from separate, not marital, property and were not gifts to her husband.   Based on the length of the parties' marriage and the fact that no income was listed for Mrs. Myers on Schedule I or on the Statement of Financial Affairs, this may be an uphill battle requiring years of tracing.   Even if she is successful, Trustee still has a claim that Double M was an alter ego of Debtor, adding another layer of complication to Mrs. Myers' probability of success.

The $1.2 million balance of her proof of claim is also for monies she purportedly invested or were used by her husband or his companies.   She is therefore likely face the same challenges. However, her success on these fronts does not have the same known risk to the estate because there is no known asset at stake, thus there would not be a right to setoff but merely an unsecured claim.

Even if Mrs. Myers successfully proves she made investments or loans to Debtor (not one of his entities), it may mean little to the estate.   At this point in time, it appears that the pay out to unsecured creditors is pennies on the dollar.   Consequently, even if her claim is allowed in full, the actual distribution on the claim will not resemble the allowed claim.   Proof that she is a creditor of the bankruptcy estate has a far less deleterious effect than proof she is a creditor of Double M because it merely dilutes the distribution to all unsecured creditors.

Currently, there is $1.9 million escrowed from the sale of the Bayfront property.   In the best case scenario, the estate gets the entire $1.9 million.   Under this compromise, Trustee is reducing the estate's return to approximately $1.5 million in exchange for the above vagaries of litigation.   This is not wholly unreasonable.

### ii.    Litigation with Debtor

Trustee contends that Debtor hid or concealed assets or failed to keep records and is not entitled to a discharge.   The record in this case includes transcripts from the state court case that clearly show the judge believed that Debtor acted underhandedly.   Outside of this, the court cannot recall anything, nor has the Trustee directed the court's attention, to a specific item in the record that makes this claim any more than "I said, he said."   Since facts drive the outcome, it is difficult to assess the probability of success without a well-developed factual record. Moreover, Trustee's success on the § 727 action would have no immediate monetary benefit to the estate. The true benefit of success in that adversary would inure to the benefit of the creditors in the ability to pursue Mr. Myers post-bankruptcy.   The other benefit would be intangible, the over-arching protection of the integrity of the bankruptcy system.

11-61426-rk    Doc 703    FILED 01/29/15    ENTERED 01/29/15 14:56:29    Page 6 of 13

### iii. Litigation with other parties

Similarly, success in the other adversaries is speculative and may be of little value to the estate. In the Marmat adversary, it is not clear that Trustee has perfected service on the Chinese defendant which clearly decreases the likelihood of success on the underlying claims. Defendants in other adversary actions, including the Devonshire and Primary Colors actions, are strongly contesting Trustee's actions. In three adversaries, Trustee contends that Debtor concealed ownership interests or entitlements to distributions. The difficulty of these types of cases is apparent. Since Trustee has no idea what may have been hidden, these cases are naturally more difficult to prove.

After a complete and full review of the probability of success in the pending litigation, the court cannot say that Trustee erred in presenting this compromise. The probability of success is not so certain that this compromise is unreasonable.

### B. Complexity, expense and time

Trustee banks the compromise on this factor. Although Trustee doesn't discuss the complexity of the litigation in any detail, the court offered some insight on this point above. The court doesn't see that the legal issues are particularly complex but acknowledges that proving Trustee's claims may be lengthy. Additionally, Debtor now represents himself pro se, which is likely to convolute the process. As for expense, Trustee estimates to see everything to a conclusion would cost the estate an additional $500,000 in administrative expenses which would come from the pockets of the unsecured creditors. There is no guarantee that these expenses would be offset by any recovery. From an expense standpoint, the compromise seems reasonable. Instead of spending $500,000 in estate funds to reach an unknown conclusion, Trustee is giving a comparable amount to Mrs. Myers in order to end the litigation and its attendant expense, bring the case to a close, and reduce the pool of unsecured claims.

Trustee gives no indication of the time that it would take to ready the issues for trial. The court understands that discovery is complete, so it appears to be a scheduling matter. From the court's calendar, these matters could be scheduled, and possibly concluded, this calendar year but that does not factor in the challenge of coordinating the schedules of Trustee; his counsel; Mr. Myers; Mrs. Myers and her attorney; and the defendants and their counsel. This task could be monumental. The main case will be four years old and the most recently filed adversary will be two years old in April, so any additional delay is concerning. Clearly, the compromise would allow people to move forward much more quickly than litigation in an aged case.

### C. Collectability concerns

This consideration is of great concern to Creditors. During the mediation, Trustee obtained information about collectability that has not been presented in the compromise or to the

7

creditors.   Based on the factors set forth by the Sixth Circuit, collectability is explicitly material to the determination of whether a compromise is fair and equitable.   Consequently, the court cannot merely gloss over its importance.

Trustees are afforded appreciable deference in settlement decisions.   In re Engman, 331 B.R. 277 (Bankr. W.D. Mich. 2005). However, the court is not to "rubber stamp" the agreement upon a trustee's word.   Cory v. Leasure, 491 B.R. 476, 484 (W.D. Ky. 2013) (citing Hindelang v. Mid-State Aftermarket Body Parts Inc. (In re MQVP, Inc.), 477 Fed.App'x 310, 313 (6th Cir. 2012).   As previously stated, the Supreme Court advised that a court must apprise itself of the pertinent facts in determining whether a compromise is fair and equitable.   Rankin, 438 Fed.App'x 420, 426 (citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc., 390 U.S. 414, 424-25).   In Engman, the court concluded that appropriate deference is comparable to the business judgment rule, requiring the trustee to demonstrate that he acted with due diligence.   The problem for the court is that it cannot make any determination as to collectability, or determine whether Trustee acted reasonably in his settlement, without a foundation.   Blindly relying on Trustee's assertion that he assessed collectability in making the compromise deprives the court of its ability and responsibility to fully apprise itself of the wisdom of this settlement as required by the Supreme Court.   The compromise is clearly lacking proof of this consideration.

An additional comment is in order.   In small degree, the court is surprised by fervor with which Debtor and Mrs. Myers assert confidentiality.   Granted, Mrs. Myers did not file bankruptcy.   She did, however, file a significant proof of claim and assert an equitable interest in Double M, thereby opening her to scrutiny.   As for Debtor, part of collectability is nothing more than an assessment of whether Debtor accurately disclosed his assets and income to the court.   While the court acknowledges that Debtor's position may have improved since filing, the compromise clearly makes his current position, and collectability, relevant.   The court is not convinced that all of the undisclosed information is wholly confidential.   Further,   it was the court's understanding that the parties, including Trustee and MDA, were sharing discovery in an effort to save time and money.   Thousands of dollars and years later to now learn that relevant information was either not collected or not shared is perplexing.

**D.  The interest of creditors**

The court also must account for the creditors' interest, giving deference to their reasonable views on the compromise.   As the largest creditor of the estate, MDA has the most to gain and lose through this compromise, making its interest particularly consequential.   This compromise will essentially fix the value of the estate and cement the distribution to creditors.[2] MDA estimates its recovery to be in the neighborhood of 4.3% under the compromise. Creditors seek adequate information to ascertain whether this return is reasonable.   MDA is particularly concerned with the figure because it appeared that Debtor was offering a much larger

---

2 Trustee indicates the only remaining issues will include a $250,000 claim against Arnold Assoc. and the sale of a parcel of real estate that is currently under contract.

return immediately before he filed bankruptcy, giving the appearance that something is amiss. MDA's mistrust of Debtor is obvious.

In addition to the collectability issue discussed above, Creditors oppose the compromise on two other grounds. First, they say it is inappropriate to settle a § 727 action. Second, they are disturbed by Debtor's lack of contribution to the compromise in exchange for the releases against him.

### i.      Compromise of Trustee's § 727 action against Debtor

Creditors urge the court to declare Trustee's compromise of the § 727 action against Debtor improper because it equals Debtor "buying a discharge."[3]  In re Batt, 488 B.R. 341, 353 (Bankr. W.D. Ky. 2013). There is debate about whether a dischargeability action can be settled or compromised. The Batt court clearly rejected a per se prohibition against settlement of a § 727 action, refusing to mandate trial of every dischargeability action. Id. (citing Independence Bank v. Johnston (In re Johnston), 2007 WL 1239199 (Bankr. W.D. Ky. 2007) (unpublished) (citing numerous cases in accord). The court pointed out that the settlement did not guarantee the debtor a discharge because a creditor also had a § 727 action pending and ultimately approved the compromise.

Other courts, including a sister court in this district, resist compromises of § 727 actions, finding them counter to the spirit and intent of the bankruptcy code and public policy. In re Wilson, 196 B.R. 777 (Bankr. N.D. Ohio 1996). In these cases, discharges are viewed in a static frame where honest/unfortunate debtors obtain discharges and dishonest debtors do not, leaving little fluidity for compromise. To protect the system, yet not spurn litigation for the sake of litigation, these courts may employ a fifth consideration under the fair and equitable review: "the public interest in proper administration of the bankruptcy laws." Wilson at 780 (citing Jacobson v. Robert Speece Prop., Inc. (In re Speece), 159 B.R. 314, 317 (E.D. Cal. 1993)).

Looking at Wilson, Debtor's dishonesty and abuse was apparent. She failed to inform the trustee that she settled a prepetition personal injury claim for $100,000. After paying her attorney, she spent $10,000 on herself and gave her daughter $50,000 but maintained control over those funds. Of the $60,000 that was estate property, the trustee appeared likely to collect less than $35,000,[4] leaving the estate short $25,000. Consequently, in addition to finding the compromise was against public policy, the court also determined that taking $2,500 of the missing $25,000 was unreasonable.

The court agrees that, as a principle, discharges are not commodities. But the court is equally unwilling to force a trustee, or any other party, to choose between trial or dismissal. The reality is that many estates do not have funds to support litigation of a dischargeability

---

3  Or, in this case, allowing his wife to buy it for him.
4  Based on the information provided in the opinion, it appears likely that, with the compromise, the return to unsecured creditors was in the range of twenty-five to fifty percent (25-50%). Approximately $56,000 was subject to discharge in the case.

action and yet other cases may simply be bad or suffering from inherent difficulty or complexity. Forcing a trustee to gift a discharge in these cases doesn't benefit the system or enhance public policy. In this view, a compromise offers a middle ground. But when a discharge action is subject to compromise, additional scrutiny is clearly warranted. The court therefore will follow <u>Speece</u> and consider whether it is a proper exercise of the court's power to compromise a § 727 action against Debtor.

On the present facts, the court cannot conclude that Trustee has set forth adequate facts to support the compromise. Trustee's failure to discuss in any detail the potential strengths or weaknesses or the probability of success of the § 727 action leaves the court unable to weigh whether walking away from the dischargeability action is in the public interest or impugns the bankruptcy system.

### ii.    Debtor's lack of contribution

Creditors also object to Debtor's lack of contribution under the compromise, which is troublesome. However, further examination leaves the court unmoved by this argument. First, Debtor's non-exempt assets became part of the estate upon filing and Trustee was tasked with liquidating those assets and is nearly finished. Debtor has spent nearly four years in bankruptcy under Trustee's microscope, yet no one has identified anything that Debtor could or should contribute. While Creditors are concerned about hidden assets and Debtor's phoenix proclivity, both concerns are based on speculation. The court is moved by facts, not conjecture.

In addition to the direct benefits bestowed on Debtor by the compromise, Debtor will also likely reap the indirect benefits the settlement will have on his wife. Since Mrs. Myers also purports to be a large creditor of this estate, this causes the court hesitation. If Mrs. Myers' claim is accurate, this compromise gives her a ten percent (10%) return, more than double what other creditors stand to receive. And if her claim is spurious or inflated, it gives her a great deal more. But if she is entitled to fifty percent (50%) of the Bayfront proceeds, she is giving up a sizeable amount. Clearly, one may view Mrs. Myers's payment as being made on behalf of herself and Debtor. Mrs. Myers would not enter into this settlement without a release of Debtor as their fortunes are inextricably intertwined. Bankruptcy disputes are frequently settled by a payment that comes from a third party. Husbands and wives are always subject to legal strictures that force them to be considered together, such as the definition of an insider, and separately, such as the right to claim separate assets. There are many more examples, but suffice it to say that it is a duality paradox that cannot be ignored. Objectors really are objecting to reality.

Taking the above into account, is not convinced that Creditors' objection to the compromise on this ground is reasonable.

### iii.    Miscellaneous

Two other items mentioned by Creditors bear discussion. First, Creditors severely

criticized the portion of the compromise where Debtor and Mrs. Myers agreed to waive past and future objections to fee applications of Trustee's counsel. While somewhat unseemly, nothing prevents either Mrs. Myers or Debtor from declining to pursue an objection. Other parties, including Creditors, may still object and the final determination on fee applications lies with the court.

Second, this compromise is not the end game for MDA, who still has a § 727 action pending against Debtor and the ability to object to fees. These portions of the settlement bind no one except the parties to it. MDA abeyed its § 727 action pending the outcome of Trustee's action. Therefore, this compromise does not automatically mean Debtor will get a discharge. It simply means that he straddled a hurdle. Trustee cannot be required to spend all of the creditors' money to pursue Debtor in order that MDA need do so.

## CONCLUSION

Trustee failed to adequately prove that this compromise was fair and equitable, offering little discussion of key considerations. Although Trustee is entitled to deference in his decision-making, he has to demonstrate that his decision was reasonable. Trustee chose to gloss over some of the considerations, including the probability of success, electing to convince the court that an end to this litigation was paramount. On one consideration, collectability, he maintained that the information he obtained was confidential, leaving the court with little upon which to base a decision. Upon review of Creditors' objections, the court cannot conclude that their views are unreasonable. Much like the court, they want adequate information to determine whether this settlement is in their interest. As a result, the court cannot discount their objections.

As a final note, the court is not opposed to a settlement and is not opposed to *this* settlement and the court may even be willing to accept these exact terms. It simply cannot do so on this record. The parties supporting the compromise need to provide a foundation on the following issues: (1) Trustee's basis for compromising his § 727 action against Debtor and (2) facts and arguments concerning Debtor's collectability. Trustee is not obligated to pursue litigation at any expense to serve as a lottery ticket for a large, dissenting creditor.

An order denying the compromise will be entered forthwith. If he so desires, Trustee may resubmit the same proposal or may submit a different proposal, but additional reasoning and background must be provided as outlined above.

#    #    #

11

**Service List:**

Joel K Dayton
Randolph L. Snow
Chrysanthe E. Vassiles
Black, McCuskey, Souers and Arbaugh
220 Market Ave., South, Suite 1000
Canton, OH 44702

G. Christopher Meyer
Peter R. Morrison
Squire Patton Boggs (US) LLP
127 Public Square, Suite 4900
Cleveland, OH  44114-1304

John R. Gall
Aneca E. Lasley
Heather L. Stutz
Squire Patton Boggs (US) LLP
2000 Huntington Center
41 S. High St.
Columbus, OH  43215

Frederick M. Luper
Gregory H. Melick
Luper Neidenthal & Logan, LPA
1200 LeVeque Tower
50 West Broad St., Suite 1200
Columbus, OH  43215

Timothy A. Riedel
Yvette A. Cox
Bailey Cavalieri LLC
10 West Borad St., Suite 2100
Columbus, OH  43215

Susan L. Rhiel
Rhiel & Associates Co LPA
394 East Town Street
Columbus, OH  43215

12

Joseph C. Pickens
65 E. State St., #1000
Columbus, OH 43215

11-61426-rk    Doc 703    FILED 01/29/15    ENTERED 01/29/15 14:56:29    Page 13 of 13